J-S03030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: O.A.H.S., JR., AND N.B.S., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.A.H.S., A/K/A O.S., SR., FATHER | No. 2713 EDA 2014 |

Appeal from the Order entered July 29, 2014
In the Court of Common Pleas of Northampton County
Orphans' Court, at No(s): 2013-0068

BEFORE:    FORD ELLIOTT, P.J.E., PANELLA, J., and OTT, J.

MEMORANDUM BY PANELLA, J.                    **FILED FEBRUARY 17, 2015**

O.A.H.S., a/k/a/ O.S., Sr., ("Father"), appeals the order entered on July 29, 2014, which granted the petition filed by Northampton County Children and Youth and Families ("CYF") to involuntarily terminate his parental rights to his minor male child, O.A.H.S., Jr., (born in June 2009), and to his minor female child, N.B.S., (born in September 2011), collectively (the "Children"), pursuant to section 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b).  We affirm.[1]

On February 3, 2010, the trial court adjudicated O.A.H.S., Jr., dependent, and he was placed in kinship foster care with maternal relatives. At the time of O.A.H.S., Jr.'s adjudication, Father was incarcerated and serving an eight to twenty-three month sentence in Lebanon County, Pennsylvania.  Pursuant to the permanency plan, Father, upon his release

---

[1] J.E.K. ("Mother") consented to the termination of her parental rights on December 13, 2013.  Mother is not a party to this appeal.

from prison, was to maintain a stable income and stable housing, complete a psychological evaluation, complete a drug and alcohol evaluation, and comply with all service recommendations. *See* Trial Court Opinion, 7/28/14, at 2.

At the Permanency Review hearing on July 21, 2010, there was testimony that Father had been released from prison on April 30, 2010, had completed a psychological evaluation, and was also having supervised visits with O.A.S.H., Jr. *See id*. However, at the Permanency Review hearing, there was testimony that Father had been re-incarcerated for failing to maintain a parole address and for failing to provide suitable housing for O.A.H.S., Jr. By January 2011, Father had also completed a drug and alcohol evaluation, which recommended no further treatment, and had been diagnosed as bipolar with intensive mental health services, and medication was recommended. *See id*.

Father's supervised visits with O.A.H.S., Jr., were taking place at the Northampton County Courthouse for security purposes after Father threatened a visit supervisor. Importantly, Father failed to complete the parenting sessions following the visits. *See id*. at 3. At the time, Father's compliance with the Permanency Plan was listed as "moderate;" however, progress in addressing the circumstances leading to the original placement was deemed to be minimal. *See id*. Caseworker Jose Carrillo became involved with the family in early 2011. *See id*. At the Permanency Review

on July 27, 2011, there was testimony that Father was attending parenting and anger management counseling and was visiting O.A.H.S., Jr. ***See id***.

On September 14, 2011, O.A.H.S., Jr., was returned to Mother's custody, although the dependency order remained in effect. On September 26, 2011, N.B.S. was born and was not subject to a dependency order at that time.

Subsequent to the return of O.A.H.S., Jr., to Mother, CYF stopped providing bus passes to Father. At the Permanency Review hearing on January 11, 2012, there was testimony that Father had visited O.A.H.S., Jr., only one time following his return to Mother, and that Father was not attending parenting classes. During the time, Father had completed his probation supervision and was involved in mental health treatment, and Father's compliance with services was deemed to be "moderate." His progress was "minimal" due to his lack of visits with his son. ***See id***. at 3-4.

Caseworker Carrillo testified that, during 2012, Father was difficult to locate. Mr. Carrillo attempted to provide Father with bus passes, but could not reach him. When Father called Mr. Carrillo in late 2012, he refused to provide a telephone number where he could be reached. ***See id***. at 4.

On November 12, 2012, N.B.S. was taken into CYF's custody due to Mother's mental health problems and cocaine use. O.A.H.S., Jr., was returned to CYF's custody at the same time. At that time, Father had pending charges for domestic/simple assault in Lebanon County, and he had

charges for retail theft and corruption of minors in Lancaster County. *See id*.

Father was not in attendance at the November 14, 2012 hearing, and was deemed minimally compliant for attending mental health treatment only sporadically. Father had limited contact with O.A.H.S., Jr. *See id*. At the November 14, 2012 hearing, N.B.S. was adjudicated dependent. The Children were placed in the kinship foster home where O.A.H.S., Jr., had previously been placed. *See id*.

Due to Father's charges of simple assault against a paramour, he was required to perform a batterer's evaluation with Valliere and Associates. Father's whereabouts at the time were unknown to CYF until he was arrested on February 2, 2013. *See id*.

At the Permanency Hearing on April 10, 2013, Father did not appear, and there was testimony that Father was not compliant with services and had no contact either with the Children or CYF. Father had been incarcerated intermittently over the preceding six months and had been convicted of simple assault on February 12, 2013. *See id*. at 5.

On September 20, 2013, CYF filed a petition seeking the involuntary termination of parental rights of Father. At the October 12, 2013 Permanency Review hearing, there was testimony that Father was incarcerated at the State Correctional Institute at Somerset and was not eligible for release until the end of 2014. Father was deemed not compliant

with services, as he had made little progress, had not requested visits with the Children, and had not responded to information about them. *See id*.

On January 14, 2014, the trial court held a termination hearing. Following the hearing, the trial court issued an order on January 14, 2014, permitting Father to relinquish his parental rights. Father filed a timely notice of appeal and a timely concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on February 12, 2012. On March 14, 2014, the trial court vacated the order of January 14, 2014, which permitted the termination of the parental rights of Father, and ordered a hearing on May 13, 2014.

On May 13, 2014, the trial court held the involuntary termination hearing. At the hearing, Father testified that he had participated in anger management and parenting courses. Father noted that he had not sent letters or gifts to the Children while he was in prison. Next, Father testified that he was attempting to obtain an employment certificate in construction while he was in prison. He noted that he had been removed from the program due to his court appearances. Father also testified that he planned to serve his maximum sentence rather than to seek parole at an earlier date, and seeks to have the Children await his release from prison before being reunited with him. *See id*.

Father testified that he had no regular contact with O.A.H.S., Jr., for several years and has only seen N.B.S. twice in her life. Moreover, Father stated that he has never been exclusively responsible for the care of the

Children.  Father also testified that he has five other children with whom he is involved and provides for financially.  *See id*. at 6.

The Children have been in a kinship foster care home since 2012. O.A.H.S. has been in the foster home for 40 of the last 50 months (from the age of seven months to two years old, and from three years old to five years old).  Moreover, N.B.S. has been in the foster home for the last 20 months, from the age of one year old to the present nearly three years old.  *See id*.

The Children refer to their foster parents as "Mommy and Daddy."  Mr. Carrillo testified that N.B.S. clings to her foster mother, and O.A.H.S., Jr., seeks out the foster parents for help and comfort.  The Children do not ask about Father.  The foster home is the only home that the Children have known other than living briefly with Mother, who is no longer a parental resource.  At the termination hearing, Father testified that it would be in the Children's best interest to be returned to him rather than to be adopted by the foster parents.  *See id*.

By order entered on July 29, 2014, the trial court terminated Father's parental rights to the Children.  Father timely filed a notice of appeal.

Father maintains that the trial court abused its discretion in ordering the termination of his parental rights.  He argues that the trial court erred in terminating his parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b); in finding that there was no emotional bond; that it was in the best interests of the Children's welfare to terminate his parental rights;  and that

there is no compelling reason to terminate his rights. **See** Appellant's Brief

at 6-7. We disagree with Father on all counts.

Initially, we review the termination decree according to the following

standard:

> [A]ppellate courts must apply an abuse of discretion standard
> when considering a trial court's determination of a petition for
> termination of parental rights. As in dependency cases, our
> standard of review requires an appellate court to accept the
> findings of fact and credibility determinations of the trial court if
> they are supported by the record. If the factual findings are
> supported, appellate courts review to determine if the trial court
> made an error of law or abused its discretion. As has been often
> stated, an abuse of discretion does not result merely because
> the reviewing court might have reached a different conclusion.
> Instead, a decision may be reversed for an abuse of discretion
> only upon demonstration of manifest unreasonableness,
> partiality, prejudice, bias, or ill-will.
>
> [T]here are clear reasons for applying an abuse of discretion
> standard of review in these cases. We observed that, unlike trial
> courts, appellate courts are not equipped to make the fact-
> specific determinations on a cold record, where the trial judges
> are observing the parties during the relevant hearing and often
> presiding over numerous other hearings regarding the child and
> parents. Therefore, even where the facts could support an
> opposite result, as is often the case in dependency and
> termination cases, an appellate court must resist the urge to
> second guess the trial court and impose its own credibility
> determinations and judgment; instead we must defer to the trial
> judges so long as the factual findings are supported by the
> record and the court's legal conclusions are not the result of an
> error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (citations

omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the decree terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to § 2511(a)(1) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parents by conduct continuing for a period of at least six months immediately preceeding the filing of this petition either have evidenced a settled purpose of relinquishing parental claim to said children or have refused or failed to perform parental duties.

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the

effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id*. (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

Regarding the definition of "parental duties," this Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In *In re Adoption of S.P.*, our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court

- 10 -

considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The **S.P.** Court stated:

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." **Id.** at 655. We observed that the father's incarceration made his performance of this duty "more difficult." **Id.**

47 A.3d at 828. The **S.P.** Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

**Id**. (citation omitted).

In this case, Father's history is documented in the record. Father's parenting skills and concern as a parent are minimal, and he has not managed to finish his reunification plan over a period of six months or even twenty or forty months. Although Father has made some progress with some of the objectives in his plan, none of the objectives in Father's plan has been completed. The trial court found that, until Father completes the plan, success cannot be declared, and that the importance of the service

- 11 -

plan and the goals it identifies for the Children cannot be overemphasized. *See In re J.S.W.*, 651 A.2d 167 (Pa. Super. 1994).

Father has undertaken no efforts to attempt to maintain any sort of consistent involvement with the Children, either before, during, or after incarceration. Father maintained that his travel to visit the Children was an overwhelming financial hardship for him, with which CYF should have assisted him throughout the years. CYF attempted to provide Father with bus passes to travel to visitation, but, at times, Father was out of contact with CYF, or the Children were in Mother's custody. In addition, Father did not request visitation while incarcerated, and CYF did not arrange visits due to the distance and the age of the Children. After a careful review of the record, we find no merit to Father's argument concerning Section 2511(a)(1).

Next, in reviewing the evidence in support of termination under Section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Father's issues also challenge the sufficiency of the evidence to support the termination of his parental rights under Section 2511(b). In reviewing the case, the trial court found that Father cannot care for the Children's needs because he still has serious problems which have not been resolved.

With regard to Section 2511(b), the evidence reveals that Father does not have a strong bond with the Children. On the other hand, the evidence reveals that the Children have a strong emotional bond with their foster parents, who take care of all of their needs. The trial court found that there is no evidence that either child would be adversely affected if his/her relationship with Father is severed.

The competent evidence in the record shows Father failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). He did not put himself in a position to assume daily parenting responsibilities so that he could develop a real bond with the Children. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

Although Father may love the Children and desire an opportunity to serve as their father, *see* N.T., 7/12/13, at 59, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). A child's

life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. 2008) (citations omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d at 856 (citation omitted).

It was clearly in the Children's best interests to terminate Father's parental rights.

Accordingly, we affirm the order terminating Father's parental rights to the Children.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/17/2015